The MARCH GROUP, INC.,
Plaintiff/Appellee,

v.

Jerry A. BELLAR, Eagle Enterprises, James Buford, and W–W Capital Corporations, Defendant/Appellants.

Court of Appeals of Tennessee,
Middle Section.

June 7, 1995.

Permission to Appeal Denied by
Supreme Court Oct. 23, 1995.

Robert L. Trentham, Mark Tyler Seitz, Trabue, Sturdivant & Dewitt, Nashville, for Plaintiff/Appellee.

Edward P. Silva, Hartzog, Silva & Davies, Franklin, for Appellant Bellar and Buford.

Mark J. Lazzo, Klenda, Mitchell, Austerman & Zuercher, Wichita, KS, John M. Scannapieco, Boult, Cummings, Conners & Berry, Nashville, for Appellants Eagle Enterprises and W–W Capital Corporations.

## *OPINION*

CANTRELL, Judge.

In this action to collect a commission for the sale of a business, the Chancery Court of Davidson County granted summary judgment to the defendants on certain claims and granted summary judgment *sua sponte* to the plaintiff on others. We reverse the judgments the chancellor granted *sua sponte.* We also reverse the judgment *for one of the defendants on the plaintiff's claim of personal guaranty. Otherwise, we affirm.*

### I.

In October of 1991 Eagle Enterprises, Inc. (Eagle) entered into a twelve month exclusive representation agreement with The March Group, Inc. (March) promising to pay March a fee for marketing the corporation. The fee was to be determined by the sale price, and the base on which the fee would be calculated included the amount of any contingent payments such as an earn-out, a licensing agreement, royalties, or extended pay off based on future events. Jerry R. Bellar, Eagle's chief executive officer, and James Buford, its president, executed the agreement for Eagle, allegedly guaranteeing performance on the part of the company.

March's agents approached a Nevada corporation, W–W Capital (W–W), about the sale, and further negotiations between the two companies resulted in a purchase agreement signed on October 26, 1992. In that agreement W–W agreed to transfer 325,000 shares of its common stock to Mr. Bellar, Eagle's sole shareholder, for all of the outstanding Eagle shares. The parties also stipulated that the effective date of the agreement was August 31, 1992.

When March did not receive its fee, it sued Eagle, Bellar, and Buford for breach of contract. The complaint also alleged that W–W had breached a non-disclosure agreement with March, which prohibited direct negotiations between the buyer and the seller; that Eagle, Bellar, Buford and W–W had conspired to induce a breach of the non-disclo-

sure agreement; and that W–W had conspired with Eagle, Bellar, and Buford to induce a breach of March's listing agreement with Eagle. Eagle filed an answer in which it raised a defense based on Tenn.Code Ann. § 62–13–102(2) and § 62–13–105 requiring sellers of real estate to have a real estate broker's license in order to collect a commission. Eagle also filed a counterclaim against March claiming damages for fraud, breach of contract and breach of a fiduciary duty.

After the issues were joined in the pleadings, W–W and Eagle filed a joint motion for summary judgment on all claims. Bellar and Buford filed a similar motion.

The chancellor entered a memorandum and order finding that March was entitled to a $169,596.00 fee; that W–W did not breach the non-disclosure agreement; that there was no evidence of a conspiracy between W–W and Eagle or between W–W, Eagle, Bellar and Buford; that March was not due any additional compensation based upon an ancillary agreement; and that Bellar and Buford were not personally liable for March's fee. In a subsequent order the chancellor dismissed Eagle's counterclaim for fraud, breach of contract, and breach of a fiduciary duty.

### II.

On appeal Eagle asserts that the court erred in granting March summary judgment *sua sponte* on its breach of contract claim, on Eagle's assertion that the transaction should have been handled by a licensed broker, and on Eagle's counterclaim for fraud, breach of contract, and breach of a fiduciary duty.

 Except for Eagle's assertion that the transaction should have been handled by a licensed broker, we agree that the trial court erred in granting summary judgment *sua sponte* to March. While our Supreme Court has ruled that a trial judge may grant summary judgment to a non-moving party, the power must be exercised only in rare cases and with meticulous care. *Thomas v. Transport Insurance Co.,* 532 S.W.2d 263

(Tenn.1976). See also 6 Moore's Federal Practice § 56.12; 10A Wright & Miller, Federal Practice and Procedure § 2770. Such *sua sponte* action should be taken only when the party opposing summary judgment has been given notice and a reasonable opportunity to respond to all issues to be considered by the court. *Routman v. Automatic Data Processing, Inc.*, 873 F.2d 970 (6th Cir.1989) (In the Sixth Circuit the adverse party must be extended at least ten days notice before summary judgment may be entered.) See also *Yashon v. Gregory*, 737 F.2d 547 (6th Cir.1984).

Since the record does not show that the defendants were on notice that they were facing a motion for summary judgment, we think the judgments granted *sua sponte* (except as discussed below) should be reversed. The situation is different, however, where the opponent of a rule 56 motion makes an oral motion at the hearing. In that case summary judgment may be entered in the opponent's favor as long as the moving party is not prejudiced. *Tripp v. May*, 189 F.2d 198 (7th Cir.1951).

The issue of whether the sale had to be handled by a licensed real estate broker falls into this category. Although the designated record we have from the trial court does not specifically set out the individual grounds on which Eagle sought summary judgment, we can infer from the record that Eagle's defense on the licensed broker issue was presented along with March's response to the motion. That much is plain from the briefs filed in this court. Under those circumstances we think it was proper for the chancellor to grant summary judgment to either side—even the non-moving party—so long as the requirements of Rule 56 are met and no prejudice is shown to the original movant. In its brief Eagle does not allege that it was prejudiced by the procedure used in disposing of this issue, only that the chancellor was wrong as a matter of law.

We turn now to the merits of the claim that March was not allowed to collect a fee because the person handling the transaction did not hold a license to sell real estate. The uncontroverted facts show that real estate comprised approximately forty-three percent of Eagle's assets, and that the person who handled the direct negotiations between Eagle and W–W was not a licensed real estate broker. The uncontroverted facts also show, however, that March's principal officer and sole shareholder was a licensed real estate broker and that the ultimate transaction was a transfer of stock, effecting a transfer of control of the corporation, in which title to the real estate remained in the corporation.

In *Business Brokerage Centre v. Dixon*, 874 S.W.2d 1 (Tenn.1994), the court rejected an argument that the sale of a business involving *any* real estate would have to be handled by a licensed broker. Instead, the court said that a sale in which the real estate comprised a "merely incidental" part could be handled by an unlicensed intermediary.

We think the real estate involved in this transaction was truly incidental to the sale of the business. While the ratio of the real estate value to the total asset value in this case was higher than the ratio in *Business Brokerage*, the only assets actually transferred were the Eagle shares given in exchange for W–W shares. We think the term incidental should be viewed in terms of quality as well as quantity. Where the sale of a business involves only a transfer of stock, the real estate owned by the corporation should be viewed as incidental to the sale unless it is the business' principal asset.

In any event, March's principal officer and sole shareholder did hold a real estate license. While a licensed broker could not employ unlicensed agents in conducting a real estate agency, Tenn.Code Ann. § 62–13–302, we think a broker may hire a skilled professional to help put together a sale of a business. The objectives of the real estate licensing act—to protect purchasers against unfair and deceptive practices peculiar to the sale of real property, *Business Brokerage*

*Centre v. Dixon,* 874 S.W.2d 1 (Tenn.1994)—are adequately served under such circumstances.

Under the peculiar facts of this case the chancellor correctly granted summary judgment to March on this issue.

### III.

March raises its own issues on appeal concerning the court's action in granting summary judgment to Eagle and W–W on certain issues.

#### a.

■ Specifically, March asserts that the chancellor erred in ruling that March was not entitled to any compensation for an agreement between W–W and another corporation controlled by Mr. Bellar.

On the same day Eagle and W–W closed their sale, W–W and Eagle entered into marketing agreements with Agri–Sales Associates, Inc. (ASA), a corporation in which Mr. Bellar is the majority shareholder. March claims that it is entitled to a fee based on the future commissions earned by ASA on sales of W–W and Eagle products. The contention is based on the following provisions in the listing agreement:

> (i) All Transactions. Total consideration shall include any portion of consideration allocated to non-compete, consulting, lease write up, or the like; the total amount of any contingent payment (s) such as an earn-out, licensing agreement, royalties, or extended payoff based on future events; and/or any loans convertible to equity. In the event the amount of contingent payment is undetermined at the time of sale, the Owner will pay the Intermediary a marketing fee on all consideration at the applicable percentage rate as and when contingent consideration is received. Any and all contingent consideration shall be paid through escrow. Consideration shall also include any and all transactions derivative of this agreement which are executed within 730 days of the expiration of contracts to which this agreement applies.

March contends that the commissions earned under the marketing agreement come within the definition of "transactions derivative of this agreement," and that there are facts in the record from which one could infer that part of the consideration paid Mr. Bellar was for the agreement to do business with his other corporation.

The only evidence in the record, however, on which March relies is the fact that the agreements were executed at about the same time. There is no evidence that the amount W–W agreed to pay Mr. Bellar for his Eagle shares would have been different without the agreement with ASA. In fact, ASA already had an agreement with Eagle and all the proof supports a conclusion that the agreement with W–W was concluded in advance of and independent of the W–W/Eagle purchase agreement.

#### b.

■ March also contends that the chancellor erred in granting summary judgment to W–W on March's claim for a breach of the non-disclosure agreement and in granting summary judgment to Bellar, Buford and W–W on the claim for conspiracy to induce a breach of the agreement.

Upon learning of W–W's interest in Eagle March obtained a non-disclosure agreement from W–W, in which the Nevada corporation agreed to direct all communications through March unless otherwise agreed by the parties. Because the final details of the stock swap were worked out in direct negotiations between Mr. Bellar and W–W, March included a claim for a breach of the nondisclosure agreement against W–W and a claim for conspiracy to induce a breach of the listing agreement against W–W, Bellar and Buford.

Regarding the non-disclosure agreement, the chancellor found that March had given its consent to direct negotiations between W–W, Bellar and Eagle. We think the uncontradicted evidence shows that conclusion to be true. March does not deny that it gave its consent to the parties to negotiate directly, but does contend that the permission did not give W–W and Eagle the right to negotiate March out of its fee.

If it is true, however, that Eagle and W–W had permission to negotiate directly they did not breach the non-disclosure agreement. Its only provision relevant to this issue requires W–W to direct all communication through March. It may be that they conspired to harm March in another way, but a cause of action for that wrong must rest somewhere other than on the non-disclosure agreement.

### c.

■ The chancellor also granted summary judgment to W–W on March's claim that W–W induced Eagle to breach the October 2, 1991 agreement of representation. The proof in the record opposing W–W's motion for summary judgment on this issue shows that March's representative had a telephone conversation on August 26, 1992 with Mr. Buford, Eagle's president. Mr. Buford reported the results of a conversation between Mr. Bellar and W–W's chief executive officer in which they agreed that it would be easier to close the deal if Eagle did not have to pay a commission. Mr. Buford reported that Mr. Bellar was "looking for an excuse not to pay the commission." In the exchange agreement, Eagle and W–W included a provision for a $50,000 fee for March and a stipulation that Bellar would reimburse Eagle for any amount in excess of the $50,000 for which Eagle might be found liable. In *TSC Industries, Inc. v. Tomlin,* 743 S.W.2d 169 (Tenn. App.1987), this court recited the seven elements of an action for inducing a breach of contract. One of the elements is malice and another is an intent to induce a breach. From the evidence in the record we do not think any trier of fact could infer that W–W either acted maliciously toward March or intended to induce Eagle to breach the representative agreement. One might infer that Mr. Bellar intended to breach the agreement, but that inference would not support a cause of action against W–W.

### d.

Finally, March argues that the chancellor erred in granting summary judgment to Mr. Bellar and Mr. Buford on the claim against them for personal liability. The claim was based on paragraph 16 in the agreement:

16. This agreement is executed in multiple copies and the Owner's signature hereon signifies his personal guaranty as to the performance of this agreement notwithstanding his position as a corporate officer [emphasis in original].

In a space immediately after the following printed entry, "Eagle Enterprises, Inc. BY:", Mr. Bellar signed his name with the following addition "CEO". Underneath Mr. Bellar's signature appears the signature of Mr. Buford designated "Personal Signature of President."

We think paragraph 16 is ambiguous because a corporate "owner" can sign an agreement only through the acts of its officers. The interpretation argued by March would give the following effect to paragraph 16: "Every corporate officer who executes this agreement personally guarantees performance by the corporation." We think that interpretation is unreasonable.

■ Since the term "owner" is not defined in the agreement but is used in a general sense as the one owning the business being sold, paragraph 16 would only apply to a person selling a corporation—a person who also happened to be a corporate officer. It is arguable that that interpretation would include Mr. Bellar, within its terms. It is not arguable that it would include Mr. Buford. The chancellor was, therefore, correct in granting Mr. Buford summary judgment on the personal guaranty claim.

■ As to Mr. Bellar it is possible that the ambiguity in the agreement could be resolved to his detriment. We, therefore, reverse the judgment in his favor.

The chancellor's decree is reversed in part and affirmed in part and the cause is remanded to the Chancery Court of Davidson County for further proceedings in accordance with this opinion. Tax the costs on appeal one-half to Eagle and one-half to March.

TODD, P.J., and CORNELIA A. CLARK, Special Judge, concur.