# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### APRIL 17, 2006 Session

## MARSHALL BURKS, ET AL. v. ELEVATION OUTDOOR ADVERTISING, LLC f/k/a DELTA OUTDOOR ADVERTISING, LLC

### Direct Appeal from the Chancery Court for Shelby County
### No. CH-04-0086-2     Arnold Goldin, Chancellor

---

### No. W2005-01449-COA-R3-CV - Filed July 24, 2006

---

The Appellee is a billboard advertising business engaged in selling advertising space on the billboards it maintains. The Appellants contracted with the principal owner of the business to sell the business in exchange for a commission. One of the Appellants had partial ownership interest in three of the billboards serviced by the business. After closing the sale, the Appellee paid the Appellants a significantly smaller commission than the parties had agreed upon. The Appellants brought suit for breach of contract seeking to recover the remainder of the commission allegedly owed. The Appellee subsequently filed a motion for summary judgment asserting that, pursuant to the Tennessee Real Estate Broker License Act of 1973 codified at section 62-13-101 *et seq.* of the Tennessee Code, the Appellants could not recover a commission as a matter of law. The Appellee also sought to invoke the Act's provisions to recover the commission already paid to the Appellants. Finding it undisputed that the Appellants did not have a real estate broker's license when negotiating the sale of the business and that real estate comprised a significant portion of the Appellee's assets, the trial court granted the Appellee's motion for summary judgment. Further, the trial court ordered the Appellants to return the commission already paid by the Appellee. The Appellants have appealed the trial court's decision to this Court. We affirm.

**Tenn. R. App. 3. Appeal as of Right; Judgment of the Chancery Court Affirmed**

ALAN E. HIGHERS, J., delivered the opinion of the court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Keith M. Alexander, Southaven, MS, for Appellants

Irma Merrill Stratton, Memphis, TN, for Appellee

# OPINION

## I.
### FACTUAL BACKGROUND & PROCEDURAL HISTORY[1]

Martin Daniel ("Daniel") is a licensed Tennessee attorney. At the time of the events giving rise to the present case, Daniel was the principal owner[2] of Elevation Outdoor Advertising, LLC, formerly known as Delta Outdoor Advertising, LLC (hereinafter "Delta" or "Appellee"). Delta engaged in the business of leasing advertising space on the billboards it maintained.

Garrott Massie ("Massie") worked as an insurance agent, and Daniel previously had purchased insurance from Massie. After Massie expressed an interest in getting involved in the outdoor advertising business, Daniel undertook an effort to educate Massie about various aspects of the business. Around 1999, Massie began working for Delta as an independent contractor selling advertising space and checking tax maps to determine the ownership of various parcels of property. Massie worked on commission and received a per diem amount to cover the expenses he incurred in performing these tasks. At some point, Massie acquired a 10% ownership interest in three of the billboards serviced by Delta.

In 2001, Daniel decided that he wanted to sell Delta. Massie approached Daniel and asked if he could sell the business for Daniel in exchange for a commission. In April of 2001, Daniel orally agreed that, if Massie could find a buyer for the business, he would pay Massie a commission of 7% of the net proceeds received from the sale, which amount represented the gross amount received minus any debt, taxes, and/or outstanding expenses owed by Delta. According to Daniel, their deal was contingent upon Delta receiving a minimum price of $2.8 million and Massie's promise not to offer the business to Lamar Advertising Company ("Lamar"). Daniel and Massie never memorialized their oral agreement in a written contract.

---

[1] Our ability to deduce the dispositive facts in this case has been hampered by the state of the Appellants' Brief filed on appeal. After granting the Appellants numerous extensions of time within which to file their brief in this case, the Appellants finally submitted their brief to this Court. The Statement of Facts in the Appellants' Brief contains a single citation to the record. Beyond that, none of the factual statements therein contain a corresponding citation to the record. This omission led the Appellee to file a motion in this Court asking that we deem the appeal frivolous and a separate motion asking that we dismiss the appeal entirely. The Appellants responded by asking to submit a corrected brief. We denied this request, noting that the Appellants, through various extensions granted by this Court, were given in excess of eighty (80) days in which to file their brief in this case. Further, we denied the Appellee's motion asking this Court to dismiss the appeal and their motion asking that we deem the appeal to be frivolous.

The Tennessee Rules of Appellate Procedure provide that an appellant's brief shall contain "[a] statement of facts, setting forth the facts relevant to the issues presented for review *with appropriate references to the record*." TENN. R. APP. P. 27(a)(6) (2005) (emphasis added). Unless the appellant's brief contains an appendix, "reference in the briefs to the record *shall be to the pages of the record involved*." TENN. R. APP. P. 27(g) (2005) (emphasis added). We note the Appellants' failure to comply with the applicable appellate rules and we caution against such conduct in the future. In any event, we have decided to proceed with a review of the present case given the importance of the issue involved.

[2] Daniel owned 55% of the company while a gentleman by the name of Pat Pidgeon owned the remaining 45% of the company.

Massie subsequently contacted Marshall Burks ("Burks" or, collectively with Massie, the "Appellants") asking if he could assist Massie with finding a buyer for the business. Massie also introduced Burks to Daniel and told him that Burks had business connections and could assist him with finding a buyer for Delta. According to Burks, Massie felt that Burks, who worked for a paint company, could use his business relationship with Lamar to help them negotiate a sale of Delta to Lamar. In exchange for his assistance, Massie agreed to split the commission with Burks. Burks also called Daniel at a later date to reiterate that he planned to assist Massie with selling the business and would split the commission with Massie. Burks stated that, during their conversation, he informed Daniel that he and Massie were going to attempt to sell Delta to Lamar and that Daniel did not voice any concerns about the arrangement.

In June of 2001, Massie and Burks began negotiating the sale of Delta with Lamar's vice president and regional manager, Thomas Sirmon ("Sirmon"). Sirmon began evaluating Delta's records, which Burks supplied to him, in order to value the business. Lamar initially offered to purchase Delta for $2,032,850, which Daniel rejected. Lamar responded with an offer of $2,242,700. (Exhibit 1, pp. 2000-03). After receiving the second offer, Daniel told Massie and Burks that they were to have no further contact with representatives of Lamar and that he would negotiate with Lamar directly in an attempt to obtain a higher price. Daniel ultimately accepted Lamar's second offer. According to the terms of the agreement, Lamar would receive the billboard structures, all permits from state and local governmental entities, all advertising contracts, all materials and inventory, and all real estate leases held by Delta.

Burks and Massey were led to believe, apparently from discussions with Daniel, that Lamar would be assuming $800,000 in debt owed by Delta. Accordingly, they anticipated receiving a commission on the net proceeds of $1,442,700, which represented the $2,242,700 sales price minus the $800,000 debt. After concluding the sale, Delta presented Massie with a check for $29,408, which represented $26,640 in commission and $2,768 for his ownership interest in the billboards sold to Lamar. Burks received a check for $26,640 for his share of the commission. The total commission of $53,280 was significantly less than Massie and Burks had hoped to receive.

On January 14, 2004, Massie and Burks filed suit against Delta seeking damages for breach of contract. Specifically, they sought to recover the remaining $47,709 they claimed Delta owed them pursuant to their agreement. Delta filed an answer raising numerous defenses and also filed a counter-complaint asserting that it was entitled to recover the amount already paid to Massie and Burks. In its initial counter-complaint, Delta asserted that the amount previously paid to Massie and Burks represented a settlement of any claims they had arising out of the transaction. Since they brought suit, he argued that he was entitled to recoup that amount. The trial court subsequently allowed the parties to amend their complaints and answers to assert additional theories of recovery and defenses. In their amended complaint, Massie and Burks asserted that, through discovery, they learned that Lamar only assumed $377,557.50 in debt owed by Delta, therefore, Delta received $1,865,142.50 in net proceeds from the sale. Accordingly, they sought the remaining commission owed in the amount of $77,279.97, which represented the total commission owed on this new amount ($130,559.97) minus the amount already paid ($53,280).

After completing discovery, Delta filed a motion for summary judgment on the breach of

contract claim filed by Massie and Burks. Delta argued that, as a matter of law, Massie and Burks could not recover a commission on the sale of the business under the Tennessee Real Estate Broker License Act of 1973 since they were not licensed real estate brokers. In support of its motion, Delta supplied the affidavit of Sharon Peebles, Administrative Director of the Tennessee Real Estate Commission, confirming that Massie and Burks are not licensed real estate brokers. Massie and Burks filed a response arguing that the Act did not apply to this case because, among other reasons, Massie held an ownership interest in some of the assets sold and that Daniel should be estopped from invoking the Act to thwart their recovery of the remainder of the commission. In support of their response, Massie and Burks supplied their own affidavits stating that Daniel never asked to see a real estate broker's license or indicated that they needed one to sell the business.

The trial court ultimately granted Delta's motion for summary judgment, stating:

> The Court finds that real estate was not "merely incidental" to the business whose sale is at issue herein; in fact, the Court finds that real estate was integral to that business. Plaintiffs were not licensed real estate brokers at the time the business was sold. In accordance with the provisions of the Tennessee Real Estate Broker License Act of 1973, T.C.A. §§ 62-13-101 et seq., the Court finds that Tennessee law bars Plaintiffs from maintaining an action to collect compensation. The Court further finds each Plaintiff/Counterdefendant is liable for the amount each person individually received from Defendant/Counterplaintiff.
>
> The Plaintiffs' claims are dismissed with prejudice. [Delta] is awarded a judgment against [Burks] in the amount of $26,640.00 [Delta] is also awarded a judgment against [Massie] in the amount of $26,640.00.[3]

Massie and Burks timely filed a notice of appeal to this Court to contest the trial court's ruling.

## II.
### ISSUE PRESENTED

Whether the trial court properly granted summary judgment to the defendant on the plaintiffs' claim to recover a commission on the sale of a business when the plaintiffs were not licensed real estate brokers?

---

[3] We note that these amounts represent the commission paid to both Massie and Burks and not the amount paid to Massie for his ownership interest in the billboards.

# III.
## STANDARD OF REVIEW

"[T]he summary judgment process is designed to provide a quick, inexpensive means of concluding cases, in whole or in part, upon issues as to which there is no genuine dispute regarding material facts." *Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993) (citations omitted). A trial court's grant of summary judgment to a party below presents this Court solely with a question of law, which we review de novo affording no presumption of correctness to the trial court's judgment. *Webber v. State Farm Mut. Auto. Ins. Co.*, 49 S.W.3d 265, 269 (Tenn. 2001); *Canipe v. Memphis City Sch. Bd. of Educ.*, 27 S.W.3d 919, 921 (Tenn. 2000); *Penley v. Honda Motor Co., Ltd.*, 31 S.W.3d 181, 183 (Tenn. 2000). "Our task on appeal is to review the record to determine whether the requirements for granting summary judgment have been met." *Church v. Perales*, 39 S.W.3d 149, 157 (Tenn. Ct. App. 2000). In performing this task, we will utilize the same standards employed by the trial court when evaluating the motion for summary judgment. *Prince v. St. Thomas Hosp.*, 945 S.W.2d 731, 733 (Tenn. Ct. App. 1996).

"Tenn. R. Civ. P. 56.03 provides that summary judgment is appropriate where: (1) there is no genuine issue with regard to the material facts relevant to the claim or defense contained in the motion, and (2) the moving party is entitled to a judgment as a matter of law on the undisputed facts." *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997) (citations omitted); *see also Williamson County Broad. Co. v. Williamson County Bd. of Educ.*, 549 S.W.2d 371, 372 (Tenn. 1977). "[T]he party seeking summary judgment must carry the burden of persuading the court that no genuine and material factual issues exist and that it is, therefore, entitled to judgment as a matter of law." *Byrd*, 847 S.W.2d at 211. "Once it is shown by the moving party that there is no genuine issue of material fact, the nonmoving party must then demonstrate, by affidavits or discovery materials, that there is a genuine, material fact dispute to warrant a trial." *Id.* "[T]he nonmoving party cannot simply rely upon his pleadings but must set forth specific facts showing that there is a genuine issue of material fact for trial." *Id.* The trial court must view the evidence in favor of the nonmoving party and allow all reasonable inferences therefrom. *Id.* at 214. In doing so, the court is not permitted to weigh the evidence or assess the credibility of the witnesses, as these are decisions properly left for a trial. *Id.* at 216. If, however, the facts controlling the application of a given principle of law are undisputed, then summary judgment is appropriate since the court is asked to simply decide the issue of law. *Id.* at 214.

# IV.
## DISCUSSION

### *A.*
### *The Tennessee Real Estate Broker License Act of 1973*

The Tennessee Real Estate Broker License Act of 1973, codified at section 62-13-101 *et seq.* of the Tennessee Code, "is designed to protect the public from irresponsible or unscrupulous persons dealing in real estate." *Bus. Brokerage Ctr. v. Dixon*, 874 S.W.2d 1, 3 (Tenn. 1994) (citing *Prowell v. Parks*, 767 S.W.2d 633, 634 (Tenn. 1989)). "To maximize the deterrent effect of the Act, the

Legislature drafted its provisions broadly." *Id.* When previously discussing the provisions of the act, we concluded that the "statutory scheme presents a reasonable means of achieving a legitimate governmental goal." *Bowden Bldg. Corp. v. Tenn. Real Estate Comm'n*, 15 S.W.3d 434, 442 (Tenn. Ct. App. 1999).

The Act provides, in relevant part, as follows:

> It is unlawful for any person, directly or indirectly, to engage in or conduct, or to advertise or claim to be engaging in or conducting the business, or acting in the capacity of a real estate broker, affiliate broker, time-share salesperson or acquisition agent, as defined in § 62-3-102, within this state, without first obtaining a license as such broker, affiliate broker, time-share salesperson or acquisition agent, as provided in this chapter, unless exempted from obtaining a license under § 62-13-104.

TENN. CODE ANN. § 62-13-301 (Supp. 2005). The Act defines a "broker" to include the following:

> (A) "Broker" means any person who for a fee, commission, finders fee or any other valuable consideration, or with the intent or expectation of receiving the same from another, solicits, negotiates or attempts to solicit or negotiate the listing, sale, purchase, exchange, lease or option to buy, sell, rent or exchange for any real estate or of the improvements thereon or any time-share interval . . . collects rents or attempts to collect rents, auctions or offers to auction, or who advertises or holds out as engage in any of the foregoing;
> (B) "Broker" also includes any person employed by or on behalf of the owner or owners of lots or other parcels of real estate, at a salary, fee, commission, or any other valuable consideration, to sell such real estate or any part thereof, in lots or parcels or other disposition thereof. It also includes any person who engages in the business of charging an advance fee or contracting for collection of a fee in connection with any contract whereby the person undertakes primarily to promote the sale of real estate either through its listing in a publication issued primarily for such purpose, or for referral of information concerning such real estate to brokers, or both[.]

*Id.* § 62-13-102(4). An "affiliate broker" is "any person engaged under contract by or on behalf of a licensed broker to participate in any activity included in subdivision (4)." *Id.* § 62-13-102(3). "'Real estate' means and includes leaseholds, as well as any other interest or estate in land, whether corporeal, incorporeal, freehold or nonfreehold, and whether the real estate is situated in this state or elsewhere." *Id.* § 62-13-102(14).

The Act further directs that

[a]ny person who, directly or indirectly for another, with the intention or upon the promise of receiving any valuable consideration, offers, attempts or agrees to perform, or performs, any single act defined in § 62-13-102, whether as a part of a transaction, or as an entire transaction, is deemed a broker, affiliate broker or time-share salesperson within the meaning of this chapter.

*Id.* § 62-13-103(a) (1997). "The commission of a single such act by a person required to be licensed under this chapter and not so licensed constitutes a violation thereof." *Id.* § 62-13-103(b). The legislature directs that any person who fails to secure a license as required by the Act commits a Class B misdemeanor. *Id.* § 62-13–110(a)(1) (Supp. 2005). The legislature imposes an additional penalty as follows:

Any person acting as a broker, affiliate broker, time-share salesperson or acquisition agent without first obtaining a license who has received any money, or the equivalent thereof, as a fee, commission, compensation or profit by or in consequence of a violation of any provision of this chapter, is, in addition, liable for a penalty of not less than the amount of the sum of money so received and not more than three (3) times the sum so received, as may be determined by the court, which penalty may be recovered in any court of competent jurisdiction by any person aggrieved.

*Id.* § 62-13-110(b). Moreover, an unlicensed party violating the provisions of the Act is prohibited from bringing an action to recover "compensation for any act done or service rendered." *Id.* § 62-13-105 (1997).

## B.
### Summary Judgment

At the outset, we must note that it is undisputed that neither Burks nor Massie held a real estate broker's license at the time of the events giving rise to the present action. On appeal, Burks and Massie begin by arguing that the trial court erred in granting summary judgment to Delta because the Act does not apply to the facts in this case for two reasons.

First, they maintain that, since Massie was part owner of Delta, he was not required to obtain a real estate broker's license. The Act provides for certain instances where a person will be exempt from the licensing requirements, one being "[a]n owner of real estate with respect to property owned or leased by such person." TENN. CODE ANN. § 62-13-104(a)(1) (Supp. 2005). Burks and Massie correctly point out that we previously have interpreted this provision to be inapplicable to an

individual selling his own interest in real property. *See Bowden Bldg. Corp. v. Tenn. Real Estate Comm'n*, 15 S.W.3d 434, 440 (Tenn. Ct. App. 1999) ("[A]n owner of property who lists or sells its own interest in property is not a broker requiring licensing."); *Hermitage House Square v. England*, 929 S.W.2d 356, 358 (Tenn. Ct. App. 1996) ("[B]ut the restrictions on those transactions only apply where an individual is acting for another; where he is acting on his own behalf, there is no requirement that a person acquire a real estate license before negotiating a conveyance of land."). Burks and Massie argue that, while Massie's ownership interest in the business may be minimal, the Act does not set forth how much ownership is required before a license will be necessary.

In his affidavit supplied in support of the response to Delta's motion for summary judgment, Massie stated: "I owned an interest in three Boards along Interstate 40." This fact is not disputed. It also is undisputed that Delta paid Massie $2,768.00 after closing the sale with Lamar, which represented his 10% ownership interest in the three billboards. The trial court did not order Massie to repay that amount to Delta. Burks and Massie argue that a factual issue exists regarding the level of Massie's ownership interest in Delta and whether that interest qualifies for the exemption in the Act. In response, Delta asserts that the undisputed facts show that Daniel and another individual alone controlled the company, therefore, Massie had no ownership interest in the business.

In arguing their respective positions on this issue, the parties have lost sight of the overall function of the Act. It is undisputed that Massie had a 10% ownership interest in three billboards serviced by Delta and that he received payment for his interest when the business was sold to Lamar. The statutory exemption, however, requires that the owner have an interest in the *real estate* that is at issue before he or she can assert the exemption as a shield from the provisions of the Act. *See* TENN. CODE ANN. § 62-13-104(a)(1) (2005). The Act, by its very nature, "is designed to protect the public from irresponsible or unscrupulous persons dealing in *real estate*." *Bus. Brokerage Ctr. v. Dixon*, 874 S.W.2d 1, 3 (Tenn. 1994) (emphasis added). As we previously noted, the Act defines real estate to include a leasehold. *See* TENN. CODE ANN. § 62-13-102(14) (Supp. 2005).

There is nothing in the record before this Court to suggest that Massie also possessed an interest in the leases for the real property on which these billboards sat, nor did he assert any ownership interest in the real property held by Delta in either the trial court or this Court. We previously have held that a billboard constitutes a trade fixture, which retains its character as an item of personal property, and not a fixture to be considered a part of the real property on which it sits. *State ex rel. Comm'r, Dep't of Transp. v. Teasley*, 913 S.W.2d 175, 177–78 (Tenn. Ct. App. 1995). Since Massie's interest in Delta is limited to his 10% ownership of three items of personal property, he fails to qualify for the exemption set forth in the Act. While Burks joined Massie in suing to recover the remainder of the commission at issue, the Appellants logically do not argue that Burks may avail himself of the statutory exemption at issue since it is undisputed that he owned no interest in either the real or personal property of the business.

Next, Burks and Massie argue that the Act does not apply because the real estate component of the business was merely incidental to the sale of the business as a whole. Stated differently, they assert that a factual dispute exists as to whether the real estate held by Delta was merely incidental to the transaction they helped bring about.

In order to address the Appellants' argument, we must set forth the progression of the case law which serves as the basis for that argument. In *Stinson v. Potter*, 568 S.W.2d 291, 291 (Tenn. Ct. App. 1978), this Court was asked to review a trial court's grant of summary judgment to the defendants in a suit to recover a commission under a contract to sell the defendants' coal mining operation. The defendants entered into a contract with the plaintiff whereby the plaintiff was to sell their Tennessee coal mining operation, "which included all the assets of their corporation consisting of leases, coal mine, machinery, equipment, stock piled coal, management, supervision, and employees." *Id.* at 292. In return, the defendants agreed to pay the plaintiff a commission by allowing him to keep anything over $600,000 received for the business. *Id.* The plaintiff contacted an attorney in Kentucky who represented a potential buyer. *Id.* The attorney negotiated a final price of $700,000 between the defendants and his client, and he contracted with the defendants to receive a $100,000 commission for his services. *Id.*

When the plaintiff initially negotiated the deal to sell the business for the defendants, he did not possess a Tennessee real estate broker license.[4] *Id.* When the plaintiff learned that the defendants had paid a commission to the attorney, he filed suit alleging breach of contract and sought to recover the commission. *Id.* The trial court granted the defendants' motion for summary judgment since the plaintiff did not have a broker's license at the time of the sale. *Id.* In affirming that decision on appeal, we began by noting the existence of various rules used by the several states regarding whether the sale of a going business fell within the purview of similar legislative acts designed to regulate the sale of real estate. *Id.* at 293–94. In disposing of the case, we stated:

> [W]e conclude that the language used in our Act is broad enough to include the sale of a going business and require a real estate broker to have a real estate license.
>
> . . . .
>
> The statutory language used in [the Act] is determinative of the issues in this case. The legislature obviously intended that the Real Estate Broker License Act should apply to all brokers involved in transactions resulting in the sale of real estate and has required strict compliance with the terms of the Act before a broker can use the courts to collect fees or commissions. The plaintiff's commission contract for the sale of defendants' coal mining operation fits within the category of a sale of any interest in land or improvements thereon. We therefore conclude that the plaintiff is not entitled to receive a commission on the sale of defendants' coal mining operation because: (1) the sale of a going business including an interest in real estate is within the broad language used in our Act; (2) the plaintiff did not have a Tennessee real estate broker's license while negotiating the sale of defendants' property in this state; and (3) the contract entered

---

[4] The plaintiff had applied for a license before entering into the contract, but he did not receive his license until approximately one month after the completion of the sale. *Id.*

> into by the plaintiff and the [defendants] is not divisible, the commission being the total amount received in excess of $600,000.

*Id.* at 294–95.

In *Dickerson v. Sanders Manufacturing Company*, 658 S.W.2d 535, 536 (Tenn. Ct. App. 1983), this Court once again was asked to review the applicability of the Act in light of a trial court's grant of summary judgment to the defendants in a case involving the sale of a business. In *Dickerson*, the defendants employed the plaintiff to sell a partnership, which included real estate among its assets. *Id.* In return for selling the partnership, the plaintiff was to receive a commission of 10% of the total purchase price. *Id.* After finding that the plaintiff did not possess a real estate broker's license as required by the Act, the trial court granted the defendant's motion for summary judgment. *Id.* On appeal, we began by noting that, since the commission was to be paid in the form of 10% of the total purchase price, we could not sever the transaction into one for the sale of personalty and one for the sale of realty. *Id.* at 537. Relying on our holding in *Stinson*, we held that the plaintiff could not recover a commission as his acts constituted a violation of the Act. *Id.*

In *Business Brokerage Centre v. Dixon*, 874 S.W.2d 1, 3 (Tenn. 1994), the Tennessee Supreme Court noted that, while "this Court has never addressed the issue of whether the Act requires persons engaged in selling business entities to obtain a real estate broker's license if real property is included in the entity's assets, other jurisdictions with licensing statutes similar to Tennessee's have considered this issue." In that case, the defendants, a husband and wife, decided to sell their shares of stock and the assets of their business. *Id.* at 2. The assets consisted of "land and buildings, machinery, inventory, and accounts receivable." *Id.* The assets of the business were not valued separately. *Id.* The defendants listed their business for sale with the plaintiff, a partnership specializing in the sale of business entities. *Id.* The partners, however, were not licensed to sell real estate in Tennessee. *Id.* In exchange for selling the business, the plaintiff was to receive a commission of 10% of the total selling price. *Id.* A buyer ultimately purchased the business for $884,000, and the contract allocated $450,000 to the purchase of the real property and $434,000 to the purchase of the personal property. *Id.*

At the closing, the husband, having already paid the plaintiff $10,000 in earnest money, executed two promissory notes — one for $30,000 and the other for $20,000 — in favor of the plaintiff for the balance of the commission provided for in their agreement. The husband paid $8,306 on the $30,000 note before his death, however, the administrator of his estate refused to make any further payments on the note thereafter. *Id.* The administrator alleged that the notes were voidable because the plaintiff did not possess a real estate broker's license when it sold the property. *Id.* After conducting a bench trial, the trial court found in favor of the defendants and ordered the plaintiff to return the money already paid by the husband. *Id.* This Court affirmed the judgment by memorandum opinion. *Id.*

On appeal to the Tennessee Supreme Court, the court began by noting our previous decisions in *Stinson* and *Dickerson* discussing the various approaches used by other jurisdictions addressing this issue. *Id.* at 3–5. After considering the various approaches, the supreme court adopted the following approach for use in this state:

After considering the Act as a whole, and after reviewing its legislative history, this Court firmly believes that the central, overriding objective of the Act is to protect purchasers against unfair and deceptive practices that are peculiar to the sale of real property.

. . . .

While it is true that our real estate broker statutes are broad, and the literal language of those statutes arguably could be applied to situations in which real estate constitutes a minor part of the sale of an entire business, it is also a well-settled rule of construction that statutes must be understood in light of the purposes the Legislature intended to accomplish by their passage. *Tidwell v. Collins*, 522 S.W.2d 674 (Tenn. 1975); *In re Arnett*, 731 F.2d 358 (6th Cir. 1984). And in the event that the intent of the Legislature conflicts with the language of the statutes, or when the language produces an absurd or incongruous result when applied in specific factual situations, the intent of the Legislature will prevail over the literal language of the statute. *City of Nashville v. Gibson County*, 201 Tenn. 216, 298 S.W.2d 540 (Tenn. 1957); *Williams v. Cothron*, 199 Tenn. 618, 288 S.W.2d 698 (Tenn. 1956). Therefore, because we agree with the above-cited authorities that our real estate broker statutes simply do not fit the realities of the market for businesses as going concerns, we must reject the "bright-line" approach because the application of that rule produces results that are not consonant with the legislative intent underlying the Act. We do, however, realize that the application of the "bright-line" rule does not produce an absolute conflict with the legislative purposes of the Act; and we thus invite the Legislature to clarify this area if it deems necessary.

. . . [W]e must reject the "pure severability" approach . . . because we believe that the "merely incidental" approach better serves the legislative purposes of the Act. This approach helps to insure that the object of the transaction will in fact be the sale of a business entity; it lessens the possibility that a transaction which is actually or primarily undertaken for the purpose of selling real estate can be merely characterized by the parties as a transaction for the sale of a business in order to circumvent the real estate broker statutes. Because we expressly adopt the "merely incidental" approach, the Court of Appeals' decision in *Dickerson*, *supra*, is overruled to the extent that it held that our real estate broker statutes categorically prohibit the use of that approach.

*Id.* at 5–6. In applying this standard to the case before it, the supreme court noted:

The application of these rules to the present situation leaves

little doubt as to the proper result. Pursuant to the sales contract, the real estate component constitutes approximately 51% of the transaction, an amount that in no way can be characterized as merely incidental in view of the entire transaction. Moreover, even if we accept the valuation of the real estate in the listing agreement as the [plaintiff] urges us to do, real estate comprises approximately 30% of the transaction. While this amount obviously does not predominate, it is nevertheless a substantial part of the transaction, and therefore cannot be regarded as incidental.

*Id.* at 6. Accordingly, the plaintiff could not recover the commission as its actions constituted a violation of the Act. *Id.*

In the instant case, Burks and Massie assert that a disputed issue of fact exists as to whether the real estate involved in the sale of Delta was "merely incidental" to the overall transaction. Sirmon, who negotiated the sale on behalf of Lamar, testified as follows during his deposition:

Q.    There were about 32 leases acquired; is that correct?
A.    Yes, ma'am.

. . . .

Q.    Okay. Can you explain to the Court why leases are needed for outdoor advertising? Again, we are asking because we don't — we are not in the outdoor advertising business. Can you just give us a very basic explanation of why leases are needed?
A.    *Well, if you don't have a lease, you don't have anything to build. I mean, you can't build a structure unless you have a lease or you own the property.*
Q.    We are talking about leases. This is a lease of what?
A.    Of — it is the lease of property to build a structure and air rights to above the ground.
Q.    Is it a lease of a portion of land?
A.    Yes.
Q.    Without a lease of land, can a structure be put up?
A.    How? No. To answer your question, no.
Q.    Without a structure, can you display an add [sic]?
A.    No.
Q.    Can you tell the Court whether or not leases of land are important to outdoor advertising?
A.    *If you don't have a lease, you can't build a structure. And if you can't build a structure, you don't have a face to go sell to an advertiser so you have absolutely nothing. I mean, if you don't have a lease — if you don't have a lease, you don't have*

*a business.*

. . . .

Q. In making an offer to buy Delta, Delta's assets, did you consider the existence of the leases that it had?

A. Yes, yes.

Q. In making an offer to buy Delta's assets, did you consider the quality of those leases, by that I mean, the length of the leases, whether they were assignable, that sort of thing?

A. Uh-huh, yes. They are good long-term leases.

Q. In making an offer to buy Delta's assets, did you consider whether or not Delta had the necessary permits and licenses in place?

A. Yes.

Q. And in making an offer to buy Delta's assets, did you consider whether or not Lamar could acquire the leases that Delta had as its assets?

A. *Well, yeah. I mean, if you don't — again, if you don't have the leases, it just doesn't make any sense. You can't buy a company unless — you can't buy a billboard company unless you buy the leases.* The other consideration was the quality of the structures.

. . . .

Q. Mr. Sirmon, did Lamar have an agreement with Delta as to the apportionment of the purchase price as to the leases, as opposed to the other assets?

A. I don't think so, no.

. . . .

Q. Okay. So on the purchase price of $2,242,700, can you give me a value on of that price, what the value of the leases are, the real estate leases?

. . . .

A. *Well, I mean, I guess it's everything really. I mean, if you — again, if he didn't have — if Delta Outdoor didn't have any leases, they wouldn't have any structures.*

. . . .

A. *And I wouldn't be buying the company*.

(emphasis added).

While the Appellants assert that a genuine issue of fact exists regarding this issue, they offered no evidence in response to Delta's motion for summary judgment in an effort to refute Sirmon's testimony. Sirmon's uncontradicted testimony reveals that the real estate leases held by Delta constituted the most important aspect of the transaction. The Act expressly provides that real estate encompasses leaseholds. *See* TENN. CODE ANN. § 62-13-102(14) (Supp. 2005). "[T]he term incidental should be viewed in terms of quality as well as quantity." *March Group, Inc. v. Bellar*, 908 S.W.2d 956, 959 (Tenn. Ct. App. 1995). Pursuant to the "merely incidental" approach set forth by our supreme court in *Business Brokerage Centre v. Dixon*, 874 S.W.2d 1, 6 (Tenn. 1994), we cannot agree with the Appellant's assertion that the leases were merely incidental to the sale of the business at issue in this case. *Cf. March Group, Inc.*, 908 S.W.2d at 959 ("Where the sale of a business involves only a transfer of stock, the real estate owned by the corporation should be viewed as incidental to the sale unless it is the business['] principal asset."). Having offered no proof to contradict the evidence offered by Delta in support of its motion for summary judgment, the undisputed facts demonstrate that, as a matter of law, the Appellants cannot prevail on this argument.

In the alternative, the Appellants argue that, should this Court find that the Act does apply to the facts in this case, then Daniel, who is a licensed attorney and knew that they were not licensed real estate brokers at the time he entered into the agreement with them, is presently estopped from asserting that the agreement is unenforceable under the Act. The doctrine of equitable estoppel is not favored under Tennessee law, and the party asserting the doctrine bears the burden of proving each and every element necessary to such claim. *Robinson v. Tenn. Farmers Mut. Ins. Co.*, 857 S.W.2d 559, 563 (Tenn. Ct. App. 1993); *Bokor v. Holder*, 722 S.W.2d 676, 680 (Tenn. Ct. App. 1986). With respect to the party against whom an estoppel argument is asserted, the following elements must be proven:

> (1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) Intention, or at least expectation that such conduct shall be acted upon by the other party; (3) Knowledge, actual or constructive of the real facts.

*Osborne v. Mountain Life Ins. Co.*, 130 S.W.3d 769, 774 (Tenn. 2004) (quoting *Consumer Credit Union v. Hite*, 801 S.W.2d 822, 825 (Tenn. Ct. App. 1990)). Moreover, the following elements must be proven with regard to the party asserting the doctrine of estoppel:

> (1) Lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) Reliance upon the conduct of the party estopped; and (3) Action based thereon of such a character as to change his position prejudicially.

*Id.* (quoting *Consumer Credit Union*, 801 S.W.2d at 825); *see also Werne v. Sanderson*, 954 S.W.2d 742, 745–46 (Tenn. Ct. App. 1997).

Our supreme court has noted that, "[w]hile one is not in duty bound under all circumstances to speak out, we hold that, where one's silence enables him to acquire an unfair advantage over another in the settlement of property rights, it is his duty to speak." *Church of Christ v. McDonald*, 171 S.W.2d 817, 821 (Tenn. 1943); *see also Lusk v. Consol. Aluminum Corp.*, 655 S.W.2d 917, 920 (Tenn. 1983) ("It is also the rule in this State that equitable estoppel embraces not only ideas conveyed by words written or spoken and things actually done but includes the silence of one under a duty to speak and his omission to act, as well; negligent silence may work an equitable estoppel . . . .").

Even assuming that Daniel did have a duty to inform Burks and Massie that they must be licensed as real estate brokers before they could undertake an effort to sell the business,[5] we hold that they cannot prove the following essential element of their estoppel claim: "[l]ack of knowledge and of the means of knowledge of the truth as to the facts in question." *Osborn*, 130 S.W.3d at 774. It has been noted:

> For it is essential, as a general rule, to the application of the principle of equitable estoppel that the party claiming to have been influenced by the conduct or declarations of another to his injury, was himself not only destitute of knowledge of the state of the facts, but was also destitute of any convenient and available means of acquiring such knowledge; and that where the facts are known to both parties, or both have the same means of ascertaining the truth, there can be no estoppel.

*Crabtree v Bank*, 67 S.W. 797, 799–800 (Tenn. 1901) (citations omitted); *see also Haymon v. City of Chattanooga*, 513 S.W.2d 185, 188–89 (Tenn. Ct. App. 1973).

The Tennessee Real Estate Broker License Act of 1973 was in effect at the time Burks and Massie agreed to sell Delta on behalf of Daniel. As a general rule, every citizen is presumed to know the law. *State ex rel. Lawrence County v. Hobbs*, 250 S.W.2d 549, 553 (Tenn. 1952); *Davis v. Metro. Gov't of Nashville & Davidson County*, 620 S.W.2d 532, 535 (Tenn. Ct. App. 1981). There

---

[5] The Appellants would assert that, simply by virtue of being an attorney, Daniel knew of the existence of the Act and, therefore, owed them a duty to disclose the Act's requirements. While every attorney is duty bound to exercise reasonable skill and diligence in representing the interests of his client, *see In re Woods*, 13 S.W.2d 800, 803 (Tenn. 1929); TENN. SUP. CT. R. 8, RPC 1.1, 1.2, the record clearly establishes that Daniel was not engaged in rendering legal advice to the Appellants when entering into the oral contract. There is nothing in the record to indicate that Daniel knew of the existence of the Act when he entered into the contract with Massie and that he sought to use this supposed knowledge to his advantage. We previously have stated: "Lawyers have never been presumed to know all the law." *Cleckner v. Dale*, 719 S.W.2d 535, 542 (Tenn. Ct. App. 1986) (citing *Nat'l Sav. Bank of the D.C. v. Ward*, 100 U.S. 195, 199 (1880)). In its initial answer and counter-complaint, Delta alleged that he was entitled to recover the amounts paid to Burks and Massie because they were offered in settlement of any claims the two may have had against Delta and they breached that agreement. It was only after Delta amended its counter-complaint that it asserted the provisions of the Act for the first time below.

is nothing in the record to indicate that either Burks or Massie lacked the ability to ascertain the licensing requirements set forth in the Act, as the provisions set forth therein are a matter of public record. We have rejected the position taken by Burks and Massie in the present appeal in similar cases involving a party's lack of knowledge regarding an applicable law. *See*, *e.g.*, *Far Tower Sites, LLC v. Knox County*, 126 S.W.3d 52, 66–69 (Tenn. Ct. App. 2003) (noting that, since the appellant did not undertake any due diligence by researching the applicable zoning law, it could not prevail on its equitable estoppel claim as both parties had access to the applicable zoning law); *Sexton v. Sevier County*, 948 S.W.2d 747, 751 (Tenn. Ct. App. 1997) (holding that a trial judge seeking to supplement his salary could not prevail on his equitable estoppel claim where the law prohibited such supplementation and he had the means to ascertain that information). Accordingly, we find this aspect of the Appellants' argument to be without merit.

## IV.
### CONCLUSION

It is undisputed that neither Burks nor Massie possessed a real estate broker's license when negotiating the sale of the business at issue in this case. There is sufficient proof in the record to show that Massie acted as an unlicensed real estate broker while conducting negotiations for the sale of Delta. *See* TENN. CODE ANN. § 62-13-102(4)(A) (Supp. 2005) (defining a broker as any person who, for a commission, "solicits, negotiates or attempts to solicit or negotiate the listing, sale, purchase, exchange, lease or option to buy, sell, rent or exchange for any real estate"); *Stinson v. Potter*, 568 S.W.2d 291, 293 (Tenn. Ct. App. 1978) (finding the Act applicable to a plaintiff who, among other things, alleged in his complaint that he was to receive a commission for negotiating the sale of the plaintiff's business). Moreover, we note that many of the arguments put forth by the Appellants on appeal addressed their theories as to how Massie could recover his commission, but they failed to expressly explain how Burks is entitled to a commission as well. The Act provides that an unlicensed person acting as an affiliate broker is subject to the same penalties as the unlicensed person acting as a broker. TENN. CODE ANN. § 62-13-110 (Supp. 2005). Further, we previously have noted that

> [*a*]*ny other person*, including an employee or other agent of the owner, who lists or sells that property, however, qualifies as a broker if he or she receives or expects to receive any valuable consideration that is associated with their efforts in soliciting or negotiating the listing, sale, or purchase of the real estate.

*Bowden Bldg. Corp. v. Tenn. Real Estate Comm'n*, 15 S.W.3d 434, 440 (Tenn. Ct. App. 1999) (emphasis added). Thus, the Act prohibits Burks' actions as well. That this was a single act by the defendants is of no consequence. *See Dickerson v. Sanders Mfg. Co.*, 658 S.W.2d 535, 538 (Tenn. Ct. App. 1983) (citing section 62-13-103 of the Tennessee Code for the proposition that the performance of a single act defined in the definitions section of the Act will result in a person being deemed a broker).

The legislature provides that a person acting as a real estate broker or an affiliate broker who fails to obtain the proper license commits a Class B misdemeanor. TENN. CODE ANN. § 62-13-

110(a)(1) (Supp. 2005). In recognition of the criminal penalty imposed for violating the Act, we have noted:

> A contract made in violation of a criminal statute is illegal and unenforceable in Tennessee, and the courts of this State "will not enforce contracts made in open violation of the law, and will give no relief either by way of enforcing the contract or in giving damages for its breach."

*Binswanger S., Inc. v. Textron, Inc.*, 860 S.W.2d 862, 866 (Tenn. Ct. App. 1993) (quoting *Peterson v. Cunningham*, 6 Tenn. App. 427, 431 (Tenn. Ct. App. 1927)). In addition to the criminal penalty, the legislature provides that a person violating the Act will be prohibited from bringing suit to recover a commission. TENN. CODE ANN. § 62-13-105 (1997). Additionally, any person who receives money while acting as an unlicensed real estate broker or affiliate broker in this state is "liable for a penalty of not less than the amount of the sum of money so received and not more than three (3) times the sum so received," which may be recovered by the party aggrieved. *Id.* § 62-13-110(b) (Supp. 2005). "The decision of whether treble damages are warranted is left to the discretion of the trial court in each case." *Bus. Brokerage Ctr. v. Dixon*, 874 S.W.2d 1, 6 (Tenn. 1994).

We hold that the trial court did not err in granting summary judgment to the Appellee, Elevation Outdoor Advertising, LLC, formerly known as Delta Outdoor Advertising, LLC. Further, the trial court acted correctly in ordering the Appellants to return those sums representing a commission for the sale of the business to the Appellee. Costs of this appeal are to be taxed to the Appellants, Marshall Burks and Garrott Massie, and their surety, for which execution, if necessary, may issue.

_____

ALAN E. HIGHERS, JUDGE