IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
March 17, 2021 Session

## TORYIANA LOUISA SOTO, ET AL v. PRESIDENTIAL PROPERTIES, LLC, ET AL

**Appeal from the Circuit Court for Washington County**
**No. 34625     James E. Lauderback, Judge**

————————————————————

**No. E2020-00375-COA-R3-CV**

————————————————————

This case involves claims brought under the Tennessee Consumer Protection Act and the Tennessee Real Estate Broker License Act, along with other related claims. After a two-day trial, the trial court found in favor of the plaintiffs and awarded them treble damages and attorney's fees. The defendants appealed. We affirm in part, vacate in part, and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in part, Vacated in part, and Remanded.**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and ARNOLD B. GOLDIN, J., joined.

Cameron L. Hyder, Elizabethton, Tennessee, for the appellants, Presidential Properties, LLC, and Kenneth Gross.

Arthur M. Fowler and Arthur M. Fowler, III, Johnson City, Tennessee, for the appellees, Toryina Louisa Soto, Luis Felipe Soto, John Colbaugh, and Tina Colbaugh.

## OPINION

### I.     FACTS AND PROCEDURAL HISTORY

This case involves several claims by Toryina and Luis Soto and John and Tina Colbaugh (collectively "the Plaintiffs") against Presidential Properties, LLC ("PPLLC") and Kenneth Gross (collectively "the Defendants"). The claims stem from real estate transactions that went awry.

In 2006, the Colbaughs purchased a residential home located at 219 Michaels Ridge Road, Gray, Tennessee ("the Michaels Ridge property"). The Colbaughs lived at the Michaels Ridge property for several years but decided to sell it in 2011. Initially, they were unsuccessful. In December 2014, Mr. Gross contacted Mr. Colbaugh to inquire about the Michaels Ridge property. Mr. Gross began negotiating with Mr. Colbaugh on behalf of PPLLC to help sell the Michaels Ridge property. PPLLC is a single-member limited liability company based in Johnson City, Tennessee. Mr. Gross is the sole member, principal officer, and agent of PPLLC. Mr. Gross offered to help sell the property even though he did not have a Tennessee Real Estate Brokers License.

On December 10, 2014, the Colbaughs and Mr. Gross, on behalf of PPLLC, executed a written sales agreement concerning the Michaels Ridge property. At the time the parties executed this agreement, the Michaels Ridge property was subject to an existing mortgage of $225,000, payable by the Colbaughs. The Colbaughs and the Defendants agreed to a total purchase price of $240,000. They also agreed that closing would occur "when [Mr. Gross] [found] a buyer." If a buyer was not found by April 1, 2015, Mr. Gross would be held responsible for the existing mortgage until a buyer was found. After the parties executed this agreement, Mr. Gross began marketing the sale of the Michaels Ridge property on PPLLC's website. Promotional materials by PPLLC included disclaimers that indicated PPLLC and its workers were not real estate agents or real estate brokers.

Prior to the Colbaughs' dealings with the Defendants, the Sotos owned residential property in Kingsport, Tennessee, located at 541 Bays View Road ("the Bays View property"). In September 2012, Mr. Soto's employment transferred him to California. As a result, the Sotos decided to sell the Bays View property and executed an owner-financed sales agreement with James and Laura Williams. The Williamses agreed to pay the Sotos $688.00 per month for the Bays View property until the outstanding note on the property was satisfied. After executing the sales agreement with the Williamses, the Sotos moved to California.

In March 2015, Mr. Soto learned that he would be transferring back to Tennessee. Mr. Soto was scheduled to move back to Tennessee in April 2015. In anticipation of the move, Mrs. Soto began looking for a house to purchase in Tennessee. Mrs. Soto soon discovered that the Michaels Ridge property was listed on PPLLC's website. The listing stated that the Michaels Ridge property could be sold with "owner financing" through PPLLC. Thereafter, Mrs. Soto contacted Mr. Gross about the information on PPLLC's website and began the application process for purchasing the Michaels Ridge property. Mr. Gross assured Mrs. Soto that he owned the Michaels Ridge property and had purchased it in January 2015, although this was untrue.

On March 6, 2015, Mrs. Soto and Mr. Gross had a telephone conversation to discuss the terms for purchasing the Michaels Ridge property. The parties agreed that the Sotos

would purchase the Michaels Ridge property from the Defendants for a total purchase price of $315,00.00. At closing, the Sotos would make an initial $20,000 cash payment and assign their interest in the Bays View property to the Defendants. The parties assigned a $55,000 value on the Sotos' remaining interest in the Bays View property. The parties agreed that the Sotos would pay the remaining portion of the purchase price by making monthly payments to the Defendants.

On March 11, 2015, Mr. Gross emailed a "Letter of Intent" to the Sotos that set forth the terms for purchasing the Michaels Ridge property. The letter stated that closing would occur "on or before April 1, 2015." The Sotos signed the letter of intent and returned it to Mr. Gross. Again, Mrs. Soto believed that the $20,000 payment and the assignment of the Bays View property would transfer upon closing. However, the parties never closed on the Michaels Ridge property.

Shortly after the Sotos executed the letter of intent, Mr. Gross contacted Mr. Colbaugh to inform him that he found a buyer for the Michaels Ridge property. Mr. Gross stated that the Colbaughs would need to meet at Mr. Gross's attorney's office to close on their sale of the property to the Defendants. When the parties met at the attorney's office, Mr. Gross presented Mr. Colbaugh with two documents to sign. One document was an unsecured promissory note for $240,000; the other was a warranty deed that transferred ownership of the Michaels Ridge property from the Colbaughs to the Defendants. Despite their initial agreement, the documents indicated that the Colbaughs would remain liable for the outstanding mortgage on the Michaels Ridge property. Upon realizing that he and his wife would remain liable for the mortgage, Mr. Colbaugh refused to sign the documents presented by Mr. Gross.

After failing to close on their initial agreement, Mr. Gross contacted Mr. Colbaugh to discuss a potential lease purchase agreement for the Michaels Ridge property. As a result of this conversation, the parties executed a lease agreement with an option to purchase the Michaels Ridge property. Under this agreement, Mr. Gross agreed to "rent" the Michaels Ridge property for a term of twelve months, beginning April 1, 2015, for $1,428.96 per month.[1] As the "tenant," Mr. Gross was granted the right to sublet the property. Mr. Gross was also given an option to purchase the property for $240,000.00.[2]

Meanwhile, on April 2, 2015, Mr. Gross sent Mrs. Soto a text message to assure her that they were on track to close on the Michaels Ridge property despite failing to close by the April 1 deadline. On April 6, the parties had still not closed, and Mrs. Soto inquired about whether Mr. Soto could move into the Michaels Ridge property before closing. Mr.

---

[1] Uncoincidentally, $1,428.96 was the same amount as the Colbaughs' monthly mortgage payments for the Michaels Ridge property.

[2] Although the lease-option agreement lists PPLLC as a party to the contract, the trial court found that Mr. Gross signed the agreement individually rather than on behalf of PPLLC; meaning, Mr. Gross was personally responsible for the lease-option agreement with the Colbaughs.

- 3 -

Gross responded via text message, stating that Mr. Soto could move into the Michaels Ridge property before closing because "y'all are buying it," referring to the Sotos.

Shortly after Mr. Gross assured the Sotos that they were purchasing the Michaels Ridge property, Mr. Gross emailed the Sotos several documents. The documents included a "Warranty Deed" that conveyed the Bays View property to PPLLC and a "Real Estate Purchase Option Agreement." According to Mrs. Soto, Mr. Gross assured her that these documents were necessary to close on the Michaels Ridge property. She asserts that Mr. Gross stated the warranty deed would be held by his attorney in trust until closing on the property. The "Real Estate Purchase Option Agreement" stated that the Sotos were granted an "option" to purchase the "Property" described in the agreement. However, the "Property" described in the agreement was the Bays View property.[3] Despite the discrepancies in these new documents, Mrs. Soto claims that Mr. Gross assured her that closing would occur and that she should sign the documents without changing any terms. Believing that Mr. Gross owned the Michaels Ridge property, the Sotos signed and returned the documents to Mr. Gross. Thereafter, in mid-April 2015, the Sotos moved into the Michaels Ridge property and began making monthly payments to Mr. Gross towards the purchase of the property.[4]

Upon returning to Tennessee, Mr. Soto planned to have a housewarming party at the Michaels Ridge property. Mr. Soto contacted the Colbaughs—whom the Sotos were previously acquainted with through their church—and invited them to the party. When Mr. Soto shared the address of his "new house," Mr. Colbaugh immediately informed him that he owned the Michaels Ridge property and that Mr. Gross was simply leasing it from him. According to the Sotos, this was the first time that they became aware of the true ownership of the Michaels Ridge property. After learning of the property's true ownership, the Sotos sought the advice of legal counsel.

Although the Sotos continued to make the monthly payments to Mr. Gross—making payments for April, May, June, and July 2015—the dealings between Mr. Gross and the Sotos quickly soured. After the Sotos learned that they could not purchase the Michaels Ridge property directly from Mr. Gross, Mr. Gross demanded the $20,000 cash payment. According to Mrs. Soto, Mr. Gross informed her that if they did not make the payment as soon as possible, he would evict them from the Michaels Ridge property and would record the warranty deed that conveyed the Bays View property to PPLLC. The Sotos refused to tender the $20,000. As a result, Mr. Gross recorded the deed to the Bays View property

---

[3] We agree with the trial court that this document makes "no logical sense" for multiple reasons. First, the real property that was the subject of the "option" by Mrs. Soto was the Bays View property, which she already owned. Second, even if the agreement was intended to grant an option to purchase the Michaels Ridge property, the agreement refers to Mr. Gross as the owner of the Michaels Ridge property, and it is undisputed that Mr. Gross was not and has never been the owner of the Michaels Ridge property.

[4] Initially, Mr. Soto returned from California and moved in on his own. Mrs. Soto remained in California for approximately three months.

and began collecting payments from the Williamses. In total, Mr. Gross collected 37 payments from the Williamses.

The Sotos vacated the Michaels Ridge property in July 2015. After the Sotos were no longer residing at the Michaels Ridge property, Mr. Gross continued to make payments to Mr. Colbaugh under their lease agreement. Mr. Gross made payments through May 2016 but failed to pay rent for June 2016. When Mr. Gross failed to make a payment for June 2016, Mr. Colbaugh sent the Defendants a "Notice of Lease Violation" and "Notice of Termination [of] Lease." Thereafter, Mr. Gross ceased making payments and vacated the Michaels Ridge property. Mr. Colbaugh re-leased the property in July 2016, losing only one month's rent. Beginning June 1, 2017, the Sotos entered into a new lease with the Colbaughs for the Michaels Ridge property.

After these transactions went awry, each party asserted several claims. On July 21, 2015, the Sotos initiated this case by filing a complaint for damages against the Defendants. The Sotos asserted claims for fraud, breach of contract, violations of the Tennessee Consumer Protection Act ("the TCPA"), and violations of the Tennessee Real Estate Broker License Act ("the Act"). The Sotos sought treble damages under Tennessee Code Annotated section 62-13-105 for the Defendants' alleged violation of the Act.

On October 2, 2015, the Defendants answered the Sotos' complaint and asserted several counter-claims. The Defendants also asserted third-party claims against the Colbaughs. The Defendants' claims against the Plaintiffs included breach of contract claims and fraud. In response to the Sotos' claims under the Act, the Defendants asserted that they "never have solicited, [or] negotiated on behalf of or between third parties in real estate purchases." Instead, the Defendants claimed that they rightfully leased, purchased, sublet, and sold properties to individuals who could not obtain traditional financing.

On March 23, 2017, the Colbaughs answered the Defendants' third-party complaint and asserted additional third-party counterclaims. The Colbaughs asserted a breach of contract claim against the Defendants based on the parties' lease agreement on the Michaels Ridge property. The Colbaughs claimed that the Defendants wrongfully failed to pay rent under the lease from June 2016 to March 2017. The Colbaughs also claimed that the Defendants were liable for damages to the property that were incurred during their tenancy.

Between the Sotos initiating this case and the eventual trial, the trial court entered several scheduling orders. In September 2016, the court entered an agreed scheduling order that determined deadlines for the parties to disclose expert witnesses. In May 2017, the trial court entered an amended scheduling order. On February 19, 2019, the trial court entered its final scheduling order, setting the final deadline for disclosing expert witnesses. Counsel for Defendants withdrew from representation prior to trial; however, the Defendants were represented by counsel when the trial court entered these scheduling

orders.

The Sotos filed their disclosures of expert witnesses on May 2, 2019. On July 23, 2019, Defendants—under the representation of counsel—filed their list of trial witnesses and exhibits. The Defendants' witness list did *not* include the disclosure of any expert witness. On November 1, 2019, counsel for the Defendants withdrew from representation. The trial court allowed the Defendants 45 days to seek alternative counsel.

The case proceeded to trial on January 9 and 10, 2020. At the start of trial, the Defendants remained without counsel. As a result, Mr. Gross represented himself and PPLLC was initially unrepresented. Mr. Gross assured the trial court that he was prepared to proceed without representation. During a recess on the first day of trial, PPLLC retained counsel.

Several witnesses testified on behalf of the Plaintiffs, including Ashley Dean Wilson, an expert witness in real estate transactions. Mr. Wilson stated that he is an experienced licensed real estate broker in Tennessee and is familiar with the requirements to be a broker in Tennessee. Mr. Wilson testified that Mr. Gross, with the intent of gaining indirect compensation, improperly advertised properties that he did not own as "for sale." Mr. Wilson stated that Mr. Gross could not engage in this activity without being a licensed real estate broker.

Mr. Gross attempted to call an expert witness of his own, but the trial court denied his request to call the expert witness. The court found that the Defendants (or their prior attorney) failed to comply with the court's scheduling order that required the disclosure of expert witnesses. Because the Defendants failed to disclose any expert witnesses before trial, the trial court barred the Defendants from calling any undisclosed expert witness.

Mr. Gross was the final witness to testify during the Plaintiffs' case-in-chief. Mr. Gross testified that he does not hold a Tennessee real estate broker's license. He claimed that he did not need a license for the transactions at issue because he was not working for a fee or commission.

The Defendants did not present any countervailing testimony, and Mr. Gross did not testify on his own behalf.

On January 15, 2020, the trial court entered a memorandum opinion that stated its findings of facts and conclusions of law. In this opinion, the trial court found that the testimonies of the Plaintiffs were "completely credible and convincing." The court concluded that Mr. Gross improperly held himself out as the owner of the Michaels Ridge property in dealing with the Sotos when, in fact, he never owned the property. The court specifically found that Mr. Gross informed the Sotos that he bought the Michaels Ridge property in January 2015. Based on its findings and the uncontroverted evidence, the trial

court concluded that the Defendants fraudulently held themselves out as the owners of the Michaels Ridge property when they were trying to sell the property to the Sotos. The court also concluded that the Defendants breached the sales contract with the Sotos by agreeing to sell and finance property that it did not own; that Mr. Gross breached the lease agreement with the Colbaughs by failing to pay rent under the lease; that Mr. Gross knowingly deceived and intentionally misled the Sotos, in violation of the TCPA; and that Mr. Gross violated the Act, which barred him from asserting any claims against the Plaintiffs.

The Sotos asserted that they were entitled to damages for Mr. Gross wrongfully collecting: (1) 37 payments of $688.00 from the Williamses for the Bays View property; (2) 4 payments of $1,430.00 for the Michaels Ridge property; and (3) an attorney's fee of $350.00 for processing their purchase application. However, the trial court concluded that the Sotos only suffered $25,806.00 in damages. The court determined that the payments on the Michaels Ridge property were "essentially rent" while they resided there and were not recoverable. The court awarded the Sotos treble damages under the TCPA for Mr. Gross's knowingly deceptive and intentionally misleading conduct. As a result, the court awarded the Sotos total damages of $77,418.00. The court also set aside the Warranty Deed that conveyed the Bays View property to the Defendants and ordered that title in the property shall be restored in favor of the Sotos.

The Colbaughs asserted that they suffered damages for Mr. Gross's breach of the lease agreement on the Michaels Ridge property. They claimed that Mr. Gross's breach resulted in lost rent for June 2016 and damages to the property that were incurred during Mr. Gross's tenancy, including damage to the deck, carpet, bedroom walls, and garage doors. The trial court agreed and awarded the Colbaughs $2,779.64 in damages.

The Plaintiffs also requested that they be awarded attorney's fees and expenses. The court awarded attorney's fees and expenses to both parties—to the Sotos under the TCPA and to the Colbaughs under an "attorney's fees" provision in the Michaels Ridge property lease agreement. Counsel for the Plaintiffs was instructed to prepare an itemization of time and expenses for the court's consideration.[5]

Counsel for the Plaintiffs filed a statement of attorney's fees on January 22, 2020. It stated that the fees and expenses were reasonable and in accordance with Tennessee Supreme Court Rule 8, section 1.5. Attached to the statement was an itemization of the counsel's time and services performed in this case. In total, the parties requested $53,463.75 in fees and $2,893.92 in expenses.

On February 10, 2020, the trial court entered a final order of judgment. In its final order, the court incorporated its January 15 memorandum opinion by reference. The court

---

[5] Although the trial court concluded that the Sotos and the Colbaughs were both entitled to attorney's fees, the parties have been represented by the same counsel throughout this case.

also restated its prior judgment, awarding the Sotos $77,418 and the Colbaughs $2,779.64 in damages. The court divested title to the Bays View property out of the Defendants' names and vested it in the Sotos pursuant to Tennessee Rule of Civil Procedure 70. The court awarded the Plaintiffs only $26,732.55 of their requested attorney's fees and $2,893.92 in litigation expenses. However, the court did not offer any reasoning on how it determined the Plaintiffs' award of attorney's fees.

The Defendants timely appealed.

## II. ISSUES PRESENTED

The Defendants have presented three issues on appeal, which we have copied verbatim herein:

1. Whether the trial court erred in not allowing Kenneth Gross to retain counsel to represent Presidential Properties, LLC;

2. Whether the trial court erred in disallowing the expert witness presented by Kenneth Gross and Presidential Properties, LLC; and

3. Whether the trial court erred in finding that Kenneth Gross and Presidential Properties, LLC violated the Tennessee Real Estate Broker License Act.

The Plaintiffs present two additional issues, which we have slightly reworded:

4. Whether the trial court erred in reducing the Plaintiffs' award of attorney's fees; and

5. Whether this Court should award the Plaintiffs additional attorney's fees incurred in this appeal.

For the reasons stated herein, we affirm in part, vacate in part, and remand.

## III. STANDARD OF REVIEW

This Court reviews a trial court's findings of fact *de novo* with a presumption of correctness. Tenn. R. App. P. 13(d); *In re Angela E.*, 303 S.W.3d 240, 246 (Tenn. 2010). Questions of law are also reviewed *de novo* but are not afforded a presumption of correctness. *Eberbach v. Eberbach*, 535 S.W.3d 467, 473 (Tenn. 2017) (citing *Barnes v. Barnes*, 193 S.W.3d 495, 498 (Tenn. 2006); *Taylor v. Fezell*, 158 S.W.3d 352, 357 (2005)).

## IV. DISCUSSION

### *A. Proceeding Without Counsel*

Defendants first argue that the trial court erred in not allowing Mr. Gross to retain counsel for PPLLC. From our review, we see no basis for the Defendants' argument on this issue. There is no indication that the trial court did not allow either PPLLC or Mr. Gross to retain counsel. To the contrary, the court allowed the Defendants multiple opportunities to retain counsel before it proceeded with trial.

As this Court has previously stated:

Parties who decide to represent themselves are entitled to fair and equal treatment by the courts. The courts should take into account that many pro se litigants have no legal training and little familiarity with the judicial system. However, the courts must also be mindful of the boundary between fairness to a pro se litigant and unfairness to the pro se litigant's adversary. Thus, the courts must not excuse pro se litigants from complying with the same substantive and procedural rules that represented parties are expected to observe.

*Young v. Barrow*, 130 S.W.3d 59, 62-63 (Tenn. Ct. App. 2003) (citations omitted). Despite the Defendants' contentions, the trial court in this case clearly afforded Mr. Gross equal treatment as a pro se litigant.

The Defendants have been represented by counsel for the majority of this case. On October 31, 2019, then-counsel for the Defendants moved to withdraw from representation. The next day, the trial court granted counsel's motion and granted the Defendants 45 days to seek other counsel. The Defendants did not request additional time to obtain new counsel nor did they object to being unrepresented at the outset of trial. Instead, at trial, Mr. Gross indicated that he was ready to proceed without representation.

At the outset of trial, the following discussion took place:

THE COURT:  Are we ready to proceed this morning?

MR. GROSS:  Yes, Sir.

  . . . .

THE COURT:  Okay. And then the other issue is [Mr. Gross] had filed a Motion to retain counsel. The LLC is a corporate defendant and so you'll be appearing [o]n your own -- are you planning on just proceeding today pro se?

MR. GROSS:         Yes, Sir. . . .

THE COURT:         Okay.  All right.  So I guess what I'm getting to is you'll be able to represent yourself.  You're a named defendant, and then the LLC is a named defendant, but you cannot act as counsel for the LLC since, I take it, you're not a licensed attorney.

MR. GROSS:         No, Sir.

The record is clear on this issue.  The trial court clearly informed Mr. Gross that he would be representing himself pro se and that he could not represent PPLLC as a pro se litigant.  As such, the Defendants' claim that Mr. Gross did not understand that he could not represent PPLLC because the judge did not make him aware of that fact is preposterous.  Mr. Gross indicated multiple times that he was ready to proceed pro se, and he took no issue with PPLLC being without counsel.  The trial court recognized the Defendants' potential need for counsel when their previous attorney moved to withdraw from representation.  After the trial court granted the Defendants 45 days to obtain new counsel, the Defendants proceeded to trial without objection.[6]

Similarly, it was not the trial court's responsibility to present proof for the Defendants.  The Defendants assert that the trial court failed to advise Mr. Gross that he could refute the testimonies presented by the Plaintiffs.  However, the court was under an obligation to act "as an impartial, neutral arbiter" rather than "an advocate for the self-represented litigant."  *Discover Bank v. McCullough*, No. M2006-01272-COA-R3-CV, 2008 WL 245976, at *4 (Tenn. Ct. App. Jan. 29, 2008); *see also Cole v. State*, 798 S.W.2d 261, 264 (Tenn. Crim. App. 1990) (stating that a trial judge "is under no obligation to become an 'advocate' for or to assist and guide the *pro se* layman through the trial thicket").  Regardless, the Defendants' assertion is a misrepresentation of what transpired at trial.  During Mr. Gross's cross-examination of Mrs. Soto, Mr. Gross disagreed with certain portions of Mrs. Soto's testimony.  In response, the trial court instructed Mr. Gross that he could present "totally different" testimony by testifying on his own behalf.  Yet, at the conclusion of the Plaintiffs' case-in-chief, the Defendants decided to rest without presenting any countervailing evidence.

We recognize that "[c]onducting litigation involving a *pro se* litigant can be difficult and challenging."  *Irvin v. City of Clarksville*, 767 S.W.2d 649, 651 (Tenn. Ct. App. 1988).  However, the Defendants have failed to assert a basis for relief in this instance.  The trial court recognized and appreciated Mr. Gross's precarious position as a pro se advocate and afforded him fair treatment as such.  *See Young*, 130 S.W.3d at 62-63.  The Defendants

---

[6] While the trial court permitted the Defendants 45 days to seek alternate counsel, in total, they were afforded 70 days to obtain new counsel before trial began.

- 10 -

were afforded adequate opportunity to obtain new counsel after their previous attorney withdrew from representation. Although Mr. Gross did not obtain new counsel for PPLLC until after trial began,[7] PPLLC did in fact obtain counsel, albeit at the eleventh hour, during a recess at trial. Therefore, we find no basis for disturbing the trial court's decision in regard to this issue.

## B. Barring the Defendants' Expert Witness

Next, the Defendants claim that the trial court erred in deciding to bar the Defendants' expert witness from testifying. The trial court barred the expert witness due to the Defendants' (or their former attorney's) failure to identify and disclose the witness in a timely manner.

"Questions regarding the admissibility, relevancy, and competency of expert testimony are left to the discretion of the trial court, and the trial court's ruling may only be overturned if that discretion is abused or arbitrarily exercised." *Mabry v. Bd. of Prof'l Responsibility of Supreme Court*, 458 S.W.3d 900, 909 (Tenn. 2014) (citation omitted). Similarly, "[a] trial judge's exclusion of expert witness testimony is subject to an abuse of discretion review by this Court." *Mayo v. Shine*, 392 S.W.3d 61, 70-71 (Tenn. Ct. App. 2012) (citing *Lyle v. Exxon Corp.*, 746 S.W.2d 694, 699 (Tenn. 1988)). "A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010).

The trial court prohibited the Defendants' expert witness from testifying because they failed to disclose the witness before the deadline that was set in the trial court's scheduling order.[8] The trial court's decision to bar the Defendants' expert witness is a common consequence of a party's failure to disclose the witness in a timely manner. *See, e.g.*, *Mikheil v. Nashville Gen. Hosp. at Meharry*, No. M2014-02301-COA-R3-CV, 2016 WL 373726, at *6-7 (Tenn. Ct. App. Jan. 29, 2016) (affirming the trial court's decision to exclude an expert witness after the party failed to timely disclose the witness); *Estate of Brock ex rel. Yadon v. Rist*, 63 S.W.3d 729, 733 (Tenn. Ct. App. 2001) (affirming the trial court's decision to exclude certain testimony of physician-experts that were not timely identified).

---

[7] On appeal, both Defendants are represented by the same counsel.

[8] On October 31, 2017, the trial court entered a consent order that rescinded its previous scheduling order. The trial court's final order indicates that a subsequent scheduling order was entered on February 19, 2019, setting a deadline for disclosing expert witnesses. However, this scheduling order is absent from the appellate record. As the appellants, it was the Defendants' "duty to prepare a record which conveys a fair, accurate, and complete account of what transpired in the trial court regarding the issues which form the basis of the appeal." *Burris v. Burris*, 512 S.W.3d 239, 247 (Tenn. Ct. App. 2016).

Based on our review, we discern no basis for reversing the trial court's decision to bar the Defendants' expert witness. The Defendants argue that because Mr. Gross lacked a clear understanding of the rules for disclosing expert witnesses, he should have been afforded additional time to properly disclose the witness. Again, as a pro se litigant, Mr. Gross was afforded fair and equal treatment by the trial court. *See Young*, 130 S.W.3d at 62. The Sotos properly disclosed their expert witnesses in a timely manner, and those witness were subsequently allowed to testify. The trial court's decision was properly within "the boundary between fairness to a pro se litigant and unfairness to the pro se litigant's adversary." *See id.* at 63. As a pro se litigant, Mr. Gross was not excused from complying with substantive and procedural rules such as the proper disclosure of expert witnesses. *See id.*

Furthermore, as we previously noted, the Defendants were represented by counsel for the majority of the pre-trial proceedings. The Defendants' former counsel did not withdraw from representation until November 1, 2019, *more than three months after* the Defendants submitted a list of trial witnesses. Their witness list did *not* include any indication that they planned to call an expert witness. Any alleged failure by the Defendants' former counsel related to the disclosure of expert witnesses does not entitle them to relief on this issue.

In sum, the trial court properly exercised its discretion in excluding the Defendants' expert witness. *See Mikheil*, 2016 WL 373726, at *7 (finding no abuse of discretion in the trial court's decision to exclude an expert witness from testifying); *Mayo*, 392 S.W.3d at 70-71 (stating a trial court's decision to exclude an expert witness is subject to an abuse of discretion standard of review). Accordingly, we affirm the trial court's decision to bar the expert witness.

### C. The Tennessee Real Estate Broker License Act

Before discussing the substance of this issue, we note that the Defendants do not take issue with several of the trial court's findings. Specifically, the Defendants do not challenge the trial court's following conclusions: (1) that the Defendants fraudulently held themselves out to be the owners of the Michaels Ridge property; (2) that the Defendants breached contracts with the Sotos and the Colbaughs; and (3) that Mr. Gross's conduct violated the TCPA when he was knowingly deceptive and intentionally misleading in obtaining the deed to the Bays View property. None of these findings are listed in the Defendants' statement of issues. Therefore, the Defendants have waived any potential challenge related to these findings. *See Pope v. Nebco Cleveland, Inc.*, 585 S.W.3d 874, 885 n.4 (Tenn. 2018) (citing *Forbess v. Forbess*, 370 S.W.3d 347, 356 (Tenn. Ct. App. 2011) (noting that an issue is waived when a party does not include it in the statement of issues); *Hodge v. Craig*, 382 S.W.3d 325, 334 (Tenn. 2012) ("Appellate review is generally limited to the issues that have been presented for review.").

Although they did not challenge many of the trial court's findings, the Defendants argue that the trial court erred in finding that they violated the Act. We disagree and affirm the trial court's conclusion that the Defendants violated the Act. As a result, we also agree that the Defendants are barred from asserting any claim for compensation against the Plaintiffs.

"The Tennessee Real Estate Broker License Act of 1973 is designed to protect the public from irresponsible or unscrupulous persons dealing in real estate." *Bus. Brokerage Centre v. Dixon*, 874 S.W.2d 1, 3 (Tenn. 1994) (citing *Prowell v. Parks*, 767 S.W.2d 633, 634 (Tenn. 1989)). The Act states that individuals must obtain a real estate broker's license before acting as a real estate broker. Tenn. Code Ann. § 62-13-301; *Bus. Brokerage Centre*, 874 S.W.2d at 3. "[F]ailure to obtain a broker's license before engaging in acts defined as 'brokering' is punishable as a Class B misdemeanor." *Bus. Brokerage Centre*, 874 S.W.2d at 3 (citing Tenn. Code Ann. § 62-13-110(a)(1)); *see also* Tenn. Code Ann. § 62-13-103(b) (stating that "a single such act by a person required to be licensed under this chapter and not so licensed constitutes a violation of this chapter"). However, the licensing requirement under the Act does not apply to the *owner* of the subject real estate. *See* Tenn. Code Ann. § 62-13-104(a)(1)(A). Any unlicensed party that "violat[es] the provisions of the Act is prohibited from bringing an action to recover 'compensation for any act done or service rendered.'" *Burks v. Elevation Outdoor Advert., LLC*, 220 S.W.3d 478, 484 (Tenn. Ct. App. 2006) (quoting Tenn. Code Ann. § 62-13-105).

Under the Act, "broker" is defined as a person "who, for a fee, commission, finders fee or any other valuable consideration or with the intent or expectation of receiving a fee . . . or any other valuable consideration from another, solicits, negotiates or attempts to solicit or negotiate the listing, sale, purchase, exchange, lease or option to buy [or] sell" real estate. Tenn. Code Ann. § 62-13-102(4)(A). Stated differently, a "broker" is a person "who receive[s] or expect[s] to receive some form of consideration from another for their efforts in soliciting or negotiating the listing, sale, or purchase of real estate." *Bowden Bldg. Corp. v. Tenn. Real Estate Comm'n*, 15 S.W.3d 434, 440, 440 n.6 (Tenn. Ct. App. 1999) (footnote omitted) (noting that "persons" includes individuals, corporations, partnerships, and associations). A person can act as a broker by directly or indirectly dealing in real estate. *See* Tenn. Code Ann. § 62-13-103(a); *Bus. Brokerage Centre*, 874 S.W.2d at 3.

It is clear that the Defendants violated the Act by Mr. Gross acting as a "broker" when he attempted to sell the Michaels Ridge property to the Sotos. It is undisputed that Mr. Gross has never owned the Michaels Ridge property. Therefore, he is not exempt from the broker license requirement under the Act. *See* Tenn. Code Ann. § 62-13-104(a)(1)(A). It is also undisputed that Mr. Gross did not have a real estate broker's license at the time he attempted to facilitate the sale of the Michaels Ridge property. We cannot agree with the Defendants' claim that they are absolved from liability due to Mr. Gross's use of disclaimers that indicated he was not a real estate broker. Further, it also matters not

- 13 -

whether the Sotos agreed to purchase the Michaels Ridge property outright or simply agreed to purchase an option to purchase the property. The Act defines a "broker" as an individual who deals or attempts to deal by "negotat[ing] the listing, sale, *purchase*, exchange, *lease or option*" to buy or sell real estate. *Id.* § 62-13-102(4)(A) (emphasis added). To hold that the Defendants did not violate that Act because Mr. Gross only attempted to sell an option in the Michaels Ridge property would be a blatant misreading of the Act.

At trial, Mr. Gross attempted to justify his lack of a broker's license by claiming that he was not working for a fee or commission when he dealt with the Sotos. Again, this assertion is an affront to the plain language of the Act. The Act defines a "broker" as a person who deals in real estate with the expectation of receiving "a fee, commission, finders fee or *any other valuable consideration*." *Id.* (emphasis added). Although Mr. Gross was not seeking a fee or commission, he expected to receive several forms of *valuable consideration* from the Sotos, including: (1) a cash payment of $20,000; (2) the warranty deed that assigned the Bays View property to PPLLC; and (3) monthly payments by the Sotos for the Michaels Ridge property.

Based on the foregoing, we affirm the trial court's conclusion that the Defendants violated the Act by Mr. Gross acting as a "broker" without obtaining a real estate broker's license. Accordingly, the Defendants are barred from asserting a claim for damages or other compensation from the Plaintiffs. *See id.* § 62-13-105 (stating that a party that violates the Act is barred from asserting a claim for compensation for the dealings that stem from the prohibited act).

### D. Attorney's Fees

In Tennessee, courts follow the "American Rule" in awarding attorney's fees. The American Rule states that "a party in a civil action may recover attorney fees only if: (1) a contractual or statutory provision creates a right to recover attorney fees; or (2) some other recognized exception to the American rule applies, allowing for recovery of such fees in a particular case." *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 308 (Tenn. 2009). Whether a party is entitled to attorney's fees under a contract is a question of law that is reviewed *de novo*. *Eberbach*, 535 S.W.3d at 473. On appeal, this Court will not interfere with a permissible award of attorney's fees unless the trial court abused its discretion in granting the award. *Taylor v. Fezell*, 158 S.W.3d 352, 359 (Tenn. 2005).

### 1. Trial Court

At trial, the court awarded the Plaintiffs attorney's fees. The Sotos were awarded attorney's fees and costs under the TCPA, specifically Tennessee Code Annotated section 47-18-109(e)(1). The Colbaughs were awarded attorney's fees and costs under an

"attorney's fees" provision of the lease agreement on the Michaels Ridge property, executed between Mr. Gross and the Colbaughs. The "attorney's fees" provision permitted the "prevailing party" to recover attorney's fees and expenses that are incurred in enforcing the agreement. Accordingly, the Sotos' award under the TCPA and the Colbaughs' award under the lease agreement were proper exceptions to the American Rule on attorney's fees. *See Cracker Barrel Old Country Store, Inc.*, 284 S.W.3d at 308.

We agree with the trial court's finding that the Plaintiffs were entitled to attorney's fees as a matter of law. However, the trial court failed to adequately state its reasoning in determining the amount of fees awarded. After the trial court issued its memorandum opinion that indicated the Plaintiffs would be awarded attorney's fees, counsel for the Plaintiffs submitted a statement of attorney's fees. The statement indicated that the Plaintiffs incurred $53,463.75 in attorney's fees. Despite the detailed statement, the trial court summarily awarded the Plaintiffs $26,732.55 in attorney's fees. The court failed to offer any explanation as to why it awarded only approximately one-half of the attorney's fees that were actually incurred by the Plaintiffs.

In any action tried without a jury, the trial court must "find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment." Tenn. R. Civ. P. 52.01. Specific findings and conclusions by the trial court are necessary to "facilitate appellate review by affording a reviewing court a clear understanding of the basis of a trial court's decision." *Lovlace v. Copley*, 418 S.W.3d 1, 34 (Tenn. 2013). When determining the amount of reasonable attorney's fees, "trial court[s] should apply the factors set forth in [Tennessee Supreme Court Rule 8, Rule of Professional Conduct] 1.5(a)(1)-(10)." *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 185 (Tenn. 2011). "To enable appellate review, trial courts should clearly and thoroughly explain the particular circumstances and factors supporting their determination of a reasonable fee in a given case." *Id.* at 186.

When tasked with reviewing an award of attorney's fees, this Court will not "guess at the rational[e] the trial court used in arriving at its decision." *Harthun v. Edens*, No. W2015-00647-COA-R3-CV, 2016 WL 1056960, at *5 (Tenn. Ct. App. Mar. 17, 2016). If a trial court makes insufficient findings on its reasoning for the award, this Court should vacate the attorney's fees decision and remand with instructions for the trial court to issue an order that complies with Tennessee Rule of Civil Procedure 52.01. *See, e.g.*, *In re Carter K.*, No. M2017-01507-COA-R3-JV, 2018 WL 896060, at *7 (Tenn. Ct. App. Feb. 14, 2018); *Harthun*, 2016 WL 1056960, at *5; *Kathryne B.F. v. Michael B.*, No. W2013-01757-COA-R3-CV, 2014 WL 992110, at *8 (Tenn. Ct. App. Mar. 13, 2014).

Because we are unable to discern the basis for the trial court's partial award of attorney's fees, we vacate the portion of the court's final order that addresses attorney's fees and remand with instructions for the trial court to make additional findings of fact and conclusions of law as to its determination of the fee award in this case.

## 2. On the Reasonableness of the Fees Awarded

The Plaintiffs also submit that they should be awarded attorney's fees on appeal. We agree. As we previously stated, the Plaintiffs were entitled to recover the attorney's fees that they incurred at trial—the Sotos under Tennessee Code Annotated section 47-18-109(e)(1) and the Colbaughs under the "attorney's fees" provision of the lease agreement that they executed with Mr. Gross. For the same reasons, we find that they are also entitled to attorney's fees incurred while defending this appeal. *See Eberbach*, 535 S.W.3d at 480-81 (awarding the appellant attorney's fees that were incurred on appeal under the parties' marital dissolution agreement); *Fayne v. Vincent*, 301 S.W.3d 162, 179 (Tenn. 2009) (awarding the appellees attorney's fees incurred on appeal under the TCPA).

Therefore, we find that the Plaintiffs are entitled to attorney's fees incurred in this appeal. We remand the case for the trial court to determine the appropriate amount of those fees with instructions to make sufficient findings on the reasonableness of the fees award.[9]

## V.  CONCLUSION

For the reasons stated herein, the trial court's decision is affirmed in part, vacated in part, and remanded. Costs of this appeal are taxed equally to the appellants, Presidential Properties, LLC and Kenneth Gross, for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE

---

[9] Although the Plaintiffs do not allege that the Defendants' appeal is frivolous, based on the facts and circumstances of this case, the Plaintiffs may have also been entitled to attorney's fees on appeal under Tennessee Code Annotated section 27-1-122. Parties may be awarded attorney's fees on appeal under section 27-1-122 for having to defend against a frivolous appeal. *See Eberbach*, 535 S.W.3d at 475. Given the Defendants' clear violations of the TCPA and the Act, it could be said that this appeal is "devoid of merit." *See Selitsch v. Selitsch*, 492 S.W.3d 677, 690 (Tenn. Ct. App. 2015) (stating that "[a] frivolous appeal is one that is devoid of merit or has no reasonable chance of success"). However, the parties do not raise this argument on appeal and therefore we decline to raise it for them. *See Church v. B & T Props., Inc.*, No. 03A01-9409-CH-00342, 1995 WL 123130, at *1 (Tenn. Ct. App. Mar. 23, 1995) (noting that the plaintiffs may have been entitled to nominal damages, but because the parties did not raise the issue, this Court did not award nominal damages *sua sponte*).